UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA as assignee and subrogee of PI, Inc.,<br><br>    Plaintiffs,<br><br>v.<br><br>LOUIS M. PASCARELLA,<br><br>    Defendant. | Civil Case No. 1:10-CV-0157<br><br>Chief Judge Curtis L. Collier |

## **M E M O R A N D U M**

Before the Court is Defendant Louis M. Pascarella's ("Defendant") motion for summary judgment and accompanying memorandum (Court File Nos. 54, 55). Plaintiff Travelers Casualty and Surety Company of America ("Plaintiff") responded (Court File No. 62), and Defendant replied (Court File No. 65). For the following reasons, the Court will **GRANT** Defendant's motion for summary judgment (Court File No. 54).

**I.     RELEVANT FACTS AND BACKGROUND**

This case concerns Defendant's alleged conversion of approximately $220,000 from PI, Inc. ("PI"), a company at which he served as Chief Financial Officer ("CFO") from 1999 or 2000 until his termination in 2007.[1] The case is brought by Plaintiff, the insurer and subrogee of PI. Plaintiff alleges Defendant converted the funds between 2000 and 2007 by: 1) charging approximately

---

[1] On August 8, 2011, the Court dismissed Plaintiff's claims for breach of fiduciary duty, fraud, and unjust enrichment, leaving only the conversion claim (*see* Court File Nos. 56, 57).

$135,000 of personal expenses to PI's credit cards; 2) using roughly $80,000 of PI's funds to pay for personal life insurance; 3) diverting approximately $18,000 of PI's money to reduce personal tax obligations; 4) using $125 of PI's funds to pay for his personal website; and 5) using $150 of PI's funds to pay for pool supplies.

On the substance of the conversion claim, Defendant's position is the expenditures were known and implicitly or explicitly sanctioned by PI; Plaintiff's position is they were not. However, the primary issue at summary judgment is not whether Defendant converted PI's funds; it is whether the conversion claim is time-barred. It is undisputed the commencement of this action fell outside Tennessee's general three-year statute of limitations for conversion claims. *See* Tenn. Code Ann. § 28-3-105(2). However, the parties dispute whether the "discovery rule" and its close cousin the "fraudulent concealment" doctrine operate to toll the statute of limitations here.[2] Accordingly, the Court will only set out facts relevant to this issue.

Defendant was employed by PI as its Controller from 1994 until 1999 or 2000, at which point he was promoted to CFO. PI is a closely held corporation engaged in manufacturing operations. Jeffry Beene is the current President of PI, and is the most recent of a long line of Beene family members who have run PI since its founding. Jeffry Beene and his brother Jones Beene own and control over 99% of the voting shares of PI. Before Jeffry Beene was president, his father, Jeff Beene, was President from 1980 until his death in 2009. During the entire time relevant to this case, Jeff Beene was the president of PI and owned and controlled over 90% of the voting shares. From

---

[2]The discovery rule would potentially apply to all alleged conversion except for any conversion involving negotiable instruments. *See Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 624 (Tenn. 2002). The fraudulent concealment doctrine would potentially apply to any conversion of negotiable instruments. *See id*. at 625.

2000 until around 2005, Jeff Beene took a leave of absence from PI. During this time, Jeffry Beene became Executive Vice President, and ran the day-to-day operations on his father's behalf. While Defendant was CFO, the officers of PI were Jeff Beene, Jeffry Beene, Jones Beene, Defendant, and, for part of the time, Gary Hosack and John Christner.

As CFO, Defendant essentially ran the accounting department, having minimal oversight from the Beenes (*see* Court File No. 66-1 ("Jeffry Beene Dep."), pp. 240, 263). Defendant had been licensed as a CPA since 1991 or 1992, but the Beene brothers had no formal accounting training. Millie Wattenbarger was the controller of PI during Defendant's tenure as CFO. Ms. Wattenbarger's duties as Controller included supervising accounts payable and payroll, preparing month-end and year-end closing financials, performing state and local tax reporting, reconciling the general ledger on a monthly basis, and other general accounting activities (Court File No. 67-5 ("Wattenbarger Dep."), pp. 13-14, 31). The parties strenuously dispute the extent to which Ms. Wattenbarger's duties involved significant decision-making responsibility, or were more of the "bookkeeping" sort. However, it is undisputed Defendant was Ms. Wattenbarger's supervisor.

It is also undisputed that between 2000 and 2007 Defendant actually engaged in the financial transactions which Plaintiff alleges were wrongful. These transactions consisted largely of credit card expenditures made on a monthly basis (Court File No. 61, ¶ 11). Ms. Wattenbarger, as Controller, was aware of the transactions the whole time they were going on, even keeping a tally of amounts Defendant owed PI (Wattenbarger Dep., pp. 74; 131-32), though she apparently did not tell any of the Beenes about them until shortly before Defendant's termination, when Jeff Beene asked her if she had noticed anything irregular (Jeffry Dep., pp. 197-98; Wattenbarger Dep., pp. 40-41). Similarly, Ms. Wattenbarger knew of, and in fact prepared, the IRS Form 941 accompanying

3

the allegedly-improper payment to the IRS on Defendant's behalf (Wattenbarger Dep., p. 89), and also personally wrote at least one of the checks used to pay for Defendant's allegedly-unauthorized life insurance policy (*id*. at pp. 119-20).

The events precipitating Defendant's termination arose from his planned transition away from PI to start his own CPA firm. In 2006, PI agreed Defendant could transition out of his role as CFO over the next year or two. Around June 2007, a dispute arose over whether PI was required to buy back stock held by Defendant. Jeff Beene questioned Defendant about paperwork related to the buy-back (Jeffry Dep., p. 198). This eventually led to the discovery Defendant had instructed the accounts payable clerk issue manual checks to him, supposedly for "bank fees," which Defendant then allegedly deposited in his personal account (*id*.). Ms. Wattenbarger knew about these checks soon after they were written (*id*. at p. 199). After discovering this transaction, PI terminated Defendant on June 29, 2007 (*id*. at p. 198). Subsequently, PI conducted an investigation which purportedly led to its discovery of the other transactions at issue in this lawsuit. Two months after Defendant's termination, PI provided a Property Loss Notice to Plaintiff regarding losses suffered from Defendant's allegedly-unauthorized expenditures. On September 8, 2008, Plaintiff paid PI $217,601.47 for its losses. On June 11, 2010, Plaintiff filed this lawsuit.

Plaintiff spends significant time identifying measures Defendant allegedly took to conceal the relevant financial transactions from PI.[3] For example, Plaintiff discusses Defendant's interactions with the outside accountants who audited PI on a yearly basis. According to Plaintiff,

---

[3]Plaintiff acknowledges Ms. Wattenbarger knew of most, if not all, of the relevant transactions; however it argues this knowledge should not be attributed to PI given Defendant's "dominance" over the accounting department, and Ms. Wattenbarger's practical status as a mere "bookkeeper," despite her nominal title of Controller (Court File No. 62, p. 20).

4

Defendant would discuss with the auditors which of the Beenes' expenses should be reclassified as personal expenditures, but he would not suggest that his own personal expenses should be so reclassified (Court File No. 62-2, ¶ 9). In fact, avers Plaintiff, Defendant never told the auditors he had made any personal expenditures with PI's funds whatsoever. Additionally, Plaintiff alleges Defendant actively hid his life insurance premium payments in PI's General Ledger, by coding them "General Insurance Payments" rather than "Life Insurance Payments." Plaintiff also claims Defendant personally classified and approved his own credit card bills, thereby keeping them out of the scrutiny of others such as Ms. Wattenbarger and Jeffry Beene. Finally, Plaintiff alleges Defendant made statements such as "I run a clean department" in order to mislead PI into trusting him more.

## II.  STANDARD OF REVIEW

Summary judgment is proper if the movant shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, but must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide

evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

**III. ANALYSIS**

Under Tennessee law, a plaintiff alleging conversion must prove: "(1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." *Ferrell v. Addington Oil Corp.*, No. 2:08-CV-74, 2010 WL 3283029, *4 (E.D. Tenn. Aug. 18, 2010). The statute of limitations for a general conversion claim in Tennessee is three years from the accrual of the action. Tenn. Code Ann. § 28-3-105(2). This statute essentially incorporates a discovery rule, insofar as Tennessee courts have held the accruing of the cause of action for general conversion "means from the time when the plaintiff knew or reasonably should have known that a cause of action existed." *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 622 (Tenn. 2002) (quoting *Stone v. Hinds*, 541 S.W.2d 598, 599 (Tenn. App. 1976)). "[T]he discovery rule is an equitable exception that tolls the running of the statute of limitations until the plaintiff knows, or in the exercise of reasonable care and diligence, should know

6

that an injury has been sustained." *Id*. at 621.

The discovery rule does not apply to conversion of negotiable instruments, however. *See id*. at 624 (finding policies particular to negotiable instruments "are best served by refusing to apply the discovery rule and by finding that the cause of action for conversion of negotiable instruments accrues when the instrument is negotiated"). Nonetheless, the Tennessee Supreme Court has held a conversion of negotiable instruments claim may be tolled if the plaintiff proves fraudulent concealment. To establish fraudulent concealment, the plaintiff must show:

> (1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so;
>
> (2) that the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence;
>
> (3) that the defendant had knowledge of the facts giving rise to the cause of action; and
>
> (4) that the defendant concealed material facts from the plaintiff by withholding information or making use of some device to mislead the plaintiff, or by failing to disclose information when he or she had a duty to do so.

*Id*. at 625.

Here, it is undisputed Plaintiff commenced the case more than three years after any alleged conversion occurred. Thus, to save its conversion claim from being time-barred, Plaintiff must establish the applicability of the discovery rule and fraudulent concealment doctrine. Despite their differences, the discovery rule and fraudulent concealment doctrine have an element in common: they both require the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence. Thus, in this case, to save its claim from being time-barred, Plaintiff must show PI could not have discovered Defendant's alleged conversion through the exercise of reasonable care and diligence. This is a showing Plaintiff has not made.

Plaintiff argues at length that Defendant made efforts to conceal his activities, primarily by remaining silent about his personal expenditures with PI's funds, approving his own transactions, and making general statements designed to self-impart an aura of trustworthiness. However, Plaintiff offers no evidence – and indeed does not even allege in its amended complaint – that PI could not have discovered Defendant's conduct through the use of reasonable care and diligence. Even assuming the truth of every fact alleged by Plaintiff – namely, that Defendant converted funds between 2000 and 2007, that Defendant took certain steps to conceal this activity, and that PI had no actual knowledge of the conversion until June 2007 – it does not follow that PI could not have learned of the conversion sooner through the exercise of reasonable care and diligence.

In fact, undisputed evidence, viewed in the light most favorable to Plaintiff, strongly suggests PI could have discovered its injury through the exercise of only *minimal* care and diligence. Plaintiff acknowledges Ms. Wattenbarger "began to note irregularities related to Defendant Pascarella making personal charges on his company American Express in 2005" (Court File No. 62, p. 17), and in fact Ms. Wattenbarger testified to noting an irregularity as far back as February 2002 (Wattenbarger Dep., pp. 39-40). Although she knew of these irregularities "the whole time they were going on" (*id*. at pp. 131-32), she did not volunteer this information. However, in 2007 the pandora's lid on Defendant's alleged conversion was lifted by the asking of a simple question: Jeff Beene asked Ms. Wattenbarger if she had seen anything irregular, and she said yes (Jeffry Dep., p. 197-198). The ease with which the alleged conversion was "discovered" belies Plaintiff's claim the discovery rule and fraudulent concealment doctrine should toll the statute of limitations. Additionally, Jeffry Beene testified it is PI's belief Ms. Wattenbarger would have told about the alleged fraud at an earlier time if she had been asked:

8

> Q. What does P.I. think? As far as Millie – as far as P.I. is concerned, Millie, if she knows about some fraud, what's she going to do?
> A. I believe, if asked, she would tell.
> Q. Okay.
> A. But not if unsolicited, no.

(*Id*. at p. 204-05).

Plaintiff makes no argument, and submits no evidence tending to show, why it would have exceeded the bounds of reasonable diligence and care for someone to ask Ms. Wattenbarger a simple question about the regularity of the ledger at some point between 2002 and the first half of 2007. In fact, Plaintiff's amended complaint and responsive brief never describe what efforts were in fact made, what reasonable care and diligence would have looked like, or why *no* reasonable efforts could have uncovered Defendant's alleged conversion. Plaintiff's response brief devotes only one sentence to the issue of reasonable diligence and care, saying "the issue of '[w]hether the plaintiff exercised reasonable care and diligence in discovering the injury or wrong is usually a fact question for the jury to determine'" (Court File No. 62, p. 20) (quoting *Wyatt v. AcandS, Inc.*, 910 S.W.2d 851, 854 (Tenn. 1995)). Of course, the fact this is "usually" the case means it is not *always* the case.[4] Where, as here, the plaintiff has not made any showing on this essential element of its claim – and *especially* where, as here, there is affirmative evidence showing the injury could have been discovered with minimal care and diligence – the Court need not commit to the jury a question on which no reasonable juror could disagree.

Accordingly, because the Court finds Plaintiff has failed to make a showing sufficient to establish the discovery rule and fraudulent concealment doctrine toll the statute of limitations in this

---

[4] Indeed, in *Wyatt*, rather than deferring to a jury, the court went on to find the plaintiffs were diligent in investigating their potential injury but did not know, and reasonably could not have known, that they sustained it. *See Wyatt*, 910 S.W.2d at 856-57.

case, the Court concludes Plaintiff's conversion claim is time-barred and Defendant is entitled to summary judgment.

## IV.     CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendant's motion for summary judgment (Court File No. 54).

**An order shall enter.**

**/s/**
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**
